UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLIDEPATH HOLDING B.V., *et al.*,

                Plaintiffs,

    -v-

SPHERION CORPORATION,

                Defendant.

Case No. 04 Civ. 9758 (KMK)

OPINION and ORDER

Appearances:

John Lang, Esq.
Martin R. Pollner, Esq.
Brian R. Socolow, Esq.
Loeb & Loeb LLP
New York, NY
*Counsel for Plaintiffs*

Bruce E. Fader, Esq.
Mara Lainie Taylor, Esq.
Proskauer Rose, LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      This action arises out of a business transaction gone bad. The Second Amended

Complaint alleges four common law causes of action, namely: (1) fraud, (2) negligent

misrepresentation, (3) aiding and abetting breach of fiduciary duty, and (4) unjust enrichment.

The related arbitration has run its course, and Defendant has moved to dismiss all counts. For

the reasons stated herein, Defendant's motion is DENIED.

## I. Background

      The facts described here are taken from the allegations in the Second Amended

Complaint, which the Court, as it must on a motion to dismiss, assumes to be true.

A.  Relevant Persons and Entities

Defendant Spherion Corporation ("Defendant") is a United States corporation which is engaged worldwide in providing outsourcing services and related support services.  (Second Am. Compl. ¶ 4.)  Spherion Technology (UK) Limited ("Spherion UK") is a wholly-owned subsidiary of Defendant, and is also alleged to be the alter ego of Defendant.  (*Id.* ¶¶ 5,8, 10-16.)  Plaintiff Glidepath Holding B.V. ("Plaintiff" or "Glidepath") is a Netherlands corporation which provided technology services and data management to its clients.  (*Id.* ¶ 2.)  Plaintiff Jeimon Holdings N.V. ("Plaintiff" or "Jeimon") is a Netherlands Antilles corporation which provides investment and venture capital to Glidepath.  (*Id.* ¶ 3.)  Reginald "John" Thompson was, during the time frame at issue here, a Managing Director of Spherion UK and later, the Chief Executive Officer of Plaintiff Glidepath.  (*Id.* ¶ 5.)  Salford Capital Partners Incorporated ("Salford"), was a business project advisor and agent of Plaintiff Jeimon.  (*Id.* ¶ 7.)

B.  The European CyberCenter Business[1]

In the fall of 2001, Spherion UK was developing a business named the "European CyberCenter Business."[2]  At this time, Spherion UK itself was suffering extensive losses, and it

---

[1]This case involves persons and documents from the United States and the United Kingdom.  As such, there are variations in spellings of certain key terms.  For instance, documents from Defendant mention the "European CyberCenter Business," while documents from Spherion UK mention the "European CyberCentre Business."  The Court will adopt American spellings, but will quote from documents using the spelling contained in the original document.

[2]There are conflicting allegations in the Second Amended Complaint regarding whether the European CyberCenter Business was operational in the fall of 2001.  At one point, the Second Amended Complaint alleges that the European CyberCenter Business had been "launched" (Second Am. Compl. ¶ 9 ("The European CyberCenter Business had been launched in the first half of 2001 . . . ."), but documents that are quoted in the Second Amended Complaint state that the business had "no operational platform" (*id.* ¶ 46(b)).  In addition, the Second

allegedly was seeking to avoid additional losses by selling off the European CyberCenter Business.  (*Id.* ¶¶ 23-25.)

In December 2001, Defendant began to assess whether it was viable to divest itself of the European CyberCenter Business.  (*Id.* ¶ 43.)  Plaintiffs allege that Defendant was interested in divesting itself of the European CyberCenter Business for five reasons:  (1) increased pressure on information technology ("IT") companies due to a declining client base for IT providers; (2) a deteriorating market for managed computer services, coupled with an overcapacity of providers; (3) an increasing financial drain on Spherion UK due to a large amount of contractual commitments; (4) a poor competitive position vis-a-vis other, more established providers already in the market; and (5) the European CyberCenter Business had a serious cashflow problem.  (*Id.*)

C.  The Alleged Fraudulent Scheme

Plaintiffs allege that, because no buyer would purchase the European CyberCenter Business if they possessed the same information as Defendant, Defendant embarked on an elaborate fraudulent scheme (the Second Amended Complaint alleges fourteen distinct components) to dupe an investor into purchasing the European CyberCenter Business.  The basis of this scheme was as follows:  (1) Thompson was directed by Defendant to seek buyers for the European CyberCenter Business, and authorized to induce them into the purchase through fraudulent means; (2) as part of the scheme, Thompson, an employee of Defendant's wholly-owned subsidiary Spherion UK, would agree to become the CEO of a new company which would receive funds from an investment company but run the European CyberCenter Business;

_____

Amended Complaint describes that in December 2001 Thompson was seeking capital to "launch" the business.  (*Id.* ¶ 77.)

(3) Defendant and Thompson agreed to thwart any potential purchaser's due diligence; and (4) Defendant agreed to maintain Thompson on its payroll throughout the course of the transaction to ensure investor confidence, but arranged, through a transaction outside his normal course of employment at Spherion UK, to pay him an additional fee for the successful transfer of the European CyberCenter Business.

The first part of this alleged scheme began in December 2001. At that time, Thompson met with a group of investors that would later become Plaintiff Jeimon. (*Id.* ¶ 76.) He gave a presentation regarding a proposed investment similar to the European CyberCenter Business, in which he proposed that he and the investors create a network of business centers to provide office management services to European clients. (*Id.* ¶ 78.) Thompson proposed that he would be the CEO of this new business (and take a stake in it), while the investors would provide the necessary capital to launch the business. (*Id.* ¶ 77.) In the December 2001 proposal, Thompson represented that the market for cyberservices in Europe was promising, and he supported this representation with both factual assertions and numerous charts. (*Id.* ¶ 80, Ex. 14.) Thompson also proposed a business plan for the new business, similar to that of the European CyberCenter Business. Thompson's proposal was aggressive and contemplated a full-service, comprehensive business with major infrastructure and over 5000 sales employees. (*Id.* ¶¶ 80-82, Ex. 14.) Plaintiffs allege that these claims were fraudulent when Thompson made them because "Thompson, [Defendant], and Spherion UK well knew that the reason [Defendant] was anxiously seeking to divest itself of the CyberCenter Business was that accurate financial information, forecasts, and projections, reflecting actual market conditions, showed that the prospects for the European CyberCenter Business were bleak and did not warrant further investment." (*Id.* ¶ 82.)

4

In addition, Plaintiffs allege that the business plan that Thompson marketed to them in the December 2001 presentation was fraudulent because it was geared to a market, and future market projections, that Defendant knew were fraudulent.  (*Id.* ¶¶ 52(f)-(g), 52(i)-(j), 78-80, 81(c), 81(e), 85(c), 100(e), 130(c), 136(b)-(d), 145(e), 145(h), 159, 167(b)-(c).)

After the presentation, Plaintiff Jeimon brought in Salford to perform due diligence on Thompson's proposal.  (*Id.* ¶ 83.)  Thompson met with the due diligence team in January 2002, and gave another presentation in which he allegedly made false statements similar to those in the December 2001 presentation.  (*Id.* ¶¶ 84-85; Ex. 15.)  After these presentations, a representative of Salford sent a "Letter of Interest" to Thompson, expressing interest in Thompson's proposal, subject to "complete financial and legal assessment and due diligence."  (*Id.* ¶ 89.)

In February 2002, Salford began to perform due diligence on the sale of the European CyberCenter Business.  During the course of due diligence, Salford demanded and received financial and legal due diligence materials.  (*Id.* ¶ 92.)  Salford also retained a respected international law firm to aid its efforts.  (*Id.*)  On April 3, 2002, after the performance of this due diligence, Salford signed a term sheet, in which it agreed to create a business entity to pursue the European CyberCenter Business and to procure US $34,000,000 in investor funding.  (*Id.* ¶ 93.)  The term sheet called for Thompson to be CEO of this newly created company and for his personal service company to have a stake in the new venture.  (*Id.*)  The term sheet specified that all investment obligations were subject to Salford's review of and satisfaction with the results of continuing due diligence.  (*Id.* ¶ 94.)  On April 9, 2002, Plaintiff Jeimon advanced $800,000 to the newly formed enterprise (which became Plaintiff Glidepath) for the purchase of assets that were in liquidation (the "Exodus assets").  (*Id.* ¶ 95.)

Also in April 2002, employees at Spherion UK were forecasting problems with the market for Spherion UK's services.  An internal presentation, attached to the Second Amended Complaint and dated April 3, 2002, titled "Technology Group: 4/03/02 Europe Update," stated, on a slide entitled "KPN status," that the market conditions for Spherion UK "continue to deteriorate."  (*Id.* ¶ 44, Ex. 3.)

As part of Salford's due diligence, Salford was required to determine Thompson's status at Spherion UK and needed to ensure that he was in fact authorized by Spherion UK, his employer, to seek prospective buyers for the European CyberCenter Business.  (*Id.* ¶ 95.) Thompson allegedly made the following representations to Salford during due diligence:  (1) Thompson was leaving Defendant on good terms; (2) Spherion UK supported Thompson's participation in the new venture; (3) Spherion UK consented to the new venture's acquisition of the Exodus assets; (4) Spherion UK would waive certain potential confidentiality and intellectual property rights that related to the new venture; (5) Spherion UK was exiting the European CyberCenter Business for reasons unrelated to its prospects for success; and (6) Thompson could work with Salford on projects related to the new venture without violating any fiduciary duty or confidentiality obligation to Spherion UK.  (*Id.* ¶ 97.)  Salford asked Spherion UK for confirmation of these representations.  (*Id.*)

On April 12, 2002, Robert Browning, a Director at Spherion UK, sent a letter to Salford, which stated:

> As per your discussions with Mr. John Thompson, we are happy to
> confirm to you the following:
>
> 1.  Spherion UK is no longer interested in the acquisition of the
> Exodus assets in Europe . . . .  Spherion interest in Exodus assets in

Europe was initiated in the first quarter of 2001 and formed part the strategy to build up at critical mass of IDC facilities and managed services capability to partner and offer in Europe.  This strategy however could not be supported following the change in the economic climate in the USA in the last quarter of 2001.  Mr. John Thompson . . . [was] therefore instructed to seek other interested parties to replace Spherion interests and commitments related to the acquisition and or operation of [Internet Data Center] assets and the provision of Spherions [sic] managed services in Europe.

In line with the change in strategy and to meet Spherion Inc[.] objective [sic] as outlined above, Mr. Thompson . . . [has] provided Salford Continental Inc. with documents related to Exodus assets in Europe together with reference due diligence papers issued to or by Spherion and it specifically authorizes the use by Salford Continental Inc. of said documents . . . .

2.  To achieve Spherion Inc[.] objective [sic] to replace its commitment to provide managed services in Europe and to operate [Internet Data Center] facilities, John Thompson . . . [was] authorised to assist third party organisations, including but not limited to Salford Continental Inc., in the acquisition of Exodus assets in various sites in Europe.  It is also understood that the above mentioned Spherion employees have agreed on an individual basis to become the management and direct or indirect shareholders of the new entity which is likely to operate these assets under conditions agreed with Salford Continental Inc.

The active participation of these individuals in this process, either in their own name or in the name of Spherion to achieve the above set out objective to replace Spherion Inc[.] obligations and commitments related to offering managed services or operating [Internet Data Center's] in Europe . . . has been done with the full knowledge and approval of Spherion and does and shall not give rise to any rights for Spherion Inc. in this regard.

(*Id.* Ex. 17.)

Plaintiffs allege that this information was false on the basis of numerous communications between Thompson and other Spherion employees.  On April 18, 2002, Roy Krause, Executive

Vice President and Chief Financial Officer of Defendant, wrote to Thompson and confirmed

much of the information in the initial disclosure to Salford, notably that Thompson was

authorized by Spherion to seek buyers for the European CyberCenter business:

> I confirm that John Thompson . . . [is] authorized to share plans,
> data and information concerning Spherion's ongoing plans for the
> future of the Europeans CyberCentre business, Exodus and matters
> related thereto and also to negotiate with any potential third party
> who expresses an interest in taking over Spherion's European
> CyberCentre business and associated interest.  As we agreed, you
> will ensure that all third parties enter into appropriate
> confidentiality agreements with Spherion prior to disclosure of
> such information.  Any proposed transaction must be presented to
> Spherion's Executive Management in the United States for their
> authorization and approval prior to entering into a binding
> agreement.
>
> In so much as, the above named individuals are authorized by
> Spherion Corporation to provide plans, information,
> documentation and assistance to third parties to achieve Spherion's
> exit from the European CyberCentre market, I also confirm that the
> management team, in carrying out the above, will not be regarded
> as being in breach of the confidentiality provisions of their
> contracts of employment with Spherion.
>
> This is also to confirm that Spherion Corporation has no further
> interest in the European assets or operations of Exodus.

(*Id.* Ex. 18.)

On May 10, 2002, a letter was sent to Thompson,[3] by Roy Krause (who is not identified

on the letter), which Plaintiffs allege was sent on behalf of Spherion UK.  That letter confirmed

that Thompson was authorized to seek buyers for the European CyberCenter Business, and also

discussed a compensation package for Thompson if he succeeded.  That letter states, in relevant

---

[3]This letter is on separate letterhead and in a different format from later letters sent from
Roy Krause to John Thompson.

part:

I believe over the past few days we have made good progress in working with you to find a solution to the CyberCentre project. Reflecting this progress, I thought it would be useful for me to set out the current position.

As we stated in our letter of May 2, 2002, you are authorised to share information on the CyberCentre business with third parties and to negotiate with any third party expressing an interest in the business. This is subject to you obtaining appropriate confidentiality undertakings in favour of Spherion and any disposal will, ultimately, need to be approved by Spherion's Executive Management.

You have explained to me that you are in discussions with potential backers but that you are not able to disclose to us their identity. For us, this is less than satisfactory. However, on the basis that you have received at least an appropriate confidentiality undertaking in favour of Spherion Technology (UK) Limited, we are prepared, for the time being, to accept this. You must appreciate though that we are reserving our position and may, down the line, require you to disclose to us the identity of any potential backer before allowing you to proceed further.

We have had some discussions on the terms of your incentive package. Again, I think we have made some good progress here but there are some outstanding issues we need to resolve before formalising the arrangements. In particular, we need to be satisfied we have fully understood all commitments and liabilities in relation to the CyberCentre business. I am confident though that we will be able to reach agreement on this.

The next few weeks are likely to be difficult for us both. In particular, you will inevitably find yourself in a position of conflict given the duties you continue to owe to Spherion and your interests in a potential third party acquisition.

In view of this, and having taken advice from our attorneys, we think it is in both your and our interests to formalise the basis on which, from now on, you can commit Spherion to further obligations.

9

> . . .
>
> We are committed to working with you to put together a transfer of the CyberCentre business by June 1 under which the acquiror will agree to take on the liabilities of the business including severance payments.

(*Id.* Ex. 5.)

One week later, on May 17, 2002, Bob Pnakovich faxed a letter, on Spherion letterhead, to Thompson.  The letter was signed by Roy Krause, now identified as the Executive Vice President and Chief Financial Officer of Defendant.  That letter stated that Thompson would receive €1,300,000 if he succeeded in finding a purchases for the European CyberCenter Business.  It stated:

> As you are aware, Spherion Corporation (the "Company") is investigating the transfer of its opportunity, as well as related contractual obligations and other liabilities, in respect of the CyberCenter, as contemplated by the KPN Broadband Network b.v. Managed Services Heads of Agreement and Resellers Agreement (the "Business").  During this process, your participation and cooperation are critical.  I am writing to you, as a key executive of the Business, to offer an opportunity in this regard.  Below, I have outlined the terms of compensation for your assistance in accomplishing this transfer.
>
> For the purpose of this agreement, the Company's obligations and liabilities . . . approximate Euros 6,838,052.
>
> For your assistance in the expeditious resolution of this matter, the Company will compensate you in the amount of Euros 1,300,000.00 for effecting a transaction which would transfer fully all of the Obligations to a third party ("Newco") . . . .  Further, this offer is contingent on your full disclosure to the Company of all obligations of which you are aware and for which the Company is responsible in respect of the Business . . . .  Although we understand that the amounts stated for such items may be subject to some variation, the underlying obligations associated with these items must be transferred in full for the transaction to be

considered complete. . . .

Upon receipt of [sic] Letter of Intent . . ., the Company agrees to transfer the amount Euros 1,300,000.00 to a mutually agreeable escrow account, the custodians of which shall be one attorney to be designated by yourself, and a second attorney to be designated by the Company. . . .  The Company will reserve the right to have such monies returned to it if the transaction has not been completed by June 14, 2002. . . .

In addition, upon completion of the transaction, the Company will 1) serve you notice of termination of your employment, 2) release you from your non-competition restrictions as set forth in your employment contract, 3) release you from any obligations to work for the Company during your six (6) month notice of termination period, and 4) initiate payment to you of £121,661 (British Pounds Sterling), less any tax requested to be withheld, upon receipt of your written agreement that such payment is full and final settlement of any amounts due to you from the Company and a mutually agreed confidentiality agreement.

Regardless of your ultimate decision as to your role in the divestiture of the Business, please remember that as long as you are an employee of the Company or its subsidiaries, you continue to be bound by your fiduciary duty to act in the best interests of the Company and subject to our letter to you of May 10, 2002 pertaining to certain restrictions governing your authorities in respect of your position in the Company.

(*Id.* Ex. 6.)

As an additional part of its due diligence, "in or about the end of May 2002," Salford sought assurances from Thompson that he was not in breach of any fiduciary duty, duty of confidentiality, or any other duty owed to his employer, Spherion UK.  (*Id.* ¶ 114.)  Salford requested a copy of Thompson's termination agreement with Spherion UK.  Thompson told Salford that such an agreement existed, but that it was subject to a confidentiality agreement. (*Id.*)

11

On May 21, 2002, a solicitor, James Bloomer (who had been copied on previous correspondence between Spherion UK and Thompson), wrote to Spherion on behalf of Plaintiff Glidepath memorializing a negotiation that had occurred the day before.  Solicitor Bloomer stated:

> We refer to our discussion yesterday evening and write on behalf of GlidePath, a Company newly formed in Europe, of its intention to assume the obligations of Spherion Technology (UK) Limited in relation to Spherion's CyberCentre business in the Netherlands. The obligations comprise:  (1) capital expenditure commitments in the form of purchase orders and proposed equipment leases, related to computer software and hardware as outlined in your letter of 17th May to John Thompson[,] (2) contracts executed with KPN Telecom BV[,] (3) employment severance payments for Spherion employees working at the CyberCentre[.]

(*Id.* Ex. 19.)

In response to Solicitor Bloomer's May 21, 2002 email, Bob Livonius, Executive Vice President and Chief Operating Officer of Defendant, wrote Solicitor Bloomer on May 24, 2002, and stated:

> Thank you for your Memorandum of Understanding, dated 21 May 2002, regarding the transfer of our position in the KPN CyberCenter to GlidePath . . . .  While this project did not ultimately align well with recent changes in our strategic plans, we envision promising market opportunity for early participants offering managed services in this arena.  In this regard, we wish to offer our support to GlidePath and KPN in ongoing marketing efforts.  With Spherion's extensive client base in the U.S., we see a mutual benefit in being able to refer to GlidePath and KPN clients seeking an increased business presence in Europe.  In the coming weeks, we can formalize the protocol and channels through which to pass along these marketing leads.

(*Id.* Ex. 20.)

Plaintiffs also allege that these representations to Salford were false, as the true reason for

12

Defendant's decision to sell the European CyberCenter Business was its knowledge that the market for the business's services have collapsed.  An undated report prepared by a team of consultants from AtoBe Mobile Solutions ("AMS") at the request of Spherion management described the prospects for the European CyberCenter Business.  (*Id.* Ex. 5.)  That report stated that the value of the business did not cover its liabilities, and that there was little market for the European CyberCenter Business's services.  (*Id.*)  The Second Amended Complaint alleges, upon information and belief, that the report was delivered to Spherion US in April 2002.  (*Id.* ¶ 45.)

In an undated slide show presentation which Plaintiffs allege was presented to the Board of Directors of Defendant prior to June 15, 2002, a slide entitled "KPN Cyber Center" states:

- Good Idea
- Ahead of it's [sic] time
- Caught in a poor economy-impacting future revenue
- Opportunity to sell

(*Id.* Ex. 21.)  A later slide in the same presentation titled "European Technology" stated two options for the disposal of the KPN Cyber Center assets, and also stated "Plan: Announce our course of action in August 1, 2002."  (*Id.*)  The slide stated that there was a 50% probability that Thompson could find a purchaser for the KPN CyberCenter by June 15, 2002, and also stated that Defendant could choose to close operations by July 1, 2002.  (*Id.*)

Defendant sought to formalize its compensation agreement with Thompson in a letter dated June 25, 2002.  On that date, Roy Krause, sent a letter to Thompson, stating:

> We refer to our letter to you dated May 17th 2002 (**"the May 17th letter"**), and the subsequent email correspondence between representatives of this company and you.
>
> In view of the fact that, under the terms of your contract of employment with Spherion Technology UK (**"the UK**

Company"), you are already obliged to assist in the sale of the CyberCenter business, we are not prepared to make any further payments to you in respect of that sale over and above what is embodied in your contract.  The exception to this is that we will pay you a termination payment of £121,661, which will be paid as outlined in the 17th May letter.

We appreciate that it is not part of your duties as Managing Director of the UK Company to play any part in the company ("Newco") that would acquire the CyberCenter business.  In this regard, we understand that we must deal with Dolejsova Partners if we wish you to take an active role in Newco's acquisition of the CyberCenter business.[4]

We are therefore prepared to pay 1,300,000 Euro to Dolejsova Partners to procure that you set up Newco and ensure that Newco acquires the business.  This payment would be made in accordance with the terms of the 17th May letter.

(*Id.* Ex. 9.)

"On or about June and July of 2002," Thompson negotiated a series of novation agreements (the "Novation Agreements") which arranged for a Dutch subsidiary of Plaintiff GlidePath to be substituted as the obligor on new contracts in place of Spherion UK.  (*Id.* ¶ 116.) At the time, Thompson was both the Managing Director of Spherion UK and a senior manager of Plaintiff Glidepath.  (*Id.*)  Plaintiffs allege that the effect of these agreements was to release Spherion from the European CyberCenter liabilities.  (*Id.*)

Due diligence on the deal continued.  (*Id.* ¶ 117.)  On July 12, 2002, Defendant sent a letter to solicitor Bloomer that confirmed Thompson was no longer employed by Spherion UK. In the letter Bob Pnakovich, a director at Spherion, stated:

---

[4]Plaintiffs allege that Dolejsova Partners is a partnership between Thompson and his wife, Jolana Dolejsova, which maintained a bank account at a Bank of Scotland Offshore Limited branch in the Channel Islands.  (*Id.* ¶ 5.)

>I am able to confirm that Herbert Smith, Solicitors have been engaged by the Spherion Corporation to act regarding the disposal/closure of the Spherion Technology UK Limited business. I can also confirm that a Compromise Agreement has been signed between Spherion Technology UK Ltd and John Thompson terminating his employment contract with the Spherion Corporation.
>
>John Thompson will remain bound by various obligations, including but not limited to duties of confidentiality and non-disclosure within his Employment Contract and the Compromise Agreement.  However, these obligations do not restrict John Thompson from seeking and accepting a position with another employer.

(*Id.* Ex. 22.)  Plaintiffs allege this letter contained materially false statements, as Thompson was not finally released from his employment with Spherion until September 2002.  (*Id.* ¶ 119, Ex. 23.)

During the same time period that Salford was conducting due diligence, from May 2002 to September 2002, Plaintiff Jeimon advanced over US $12,000,000 to Plaintiff GlidePath.  (*Id.* ¶ 120.)  On September 19, 2002, Plaintiff Jeimon executed a GlidePath Shareholders Agreement with Thompson.  (*Id.* ¶ 121.)  From October 29, 2002 to September 28, 2003, Plaintiff Jeimon continued to advance funds to Plaintiff GlidePath.  These funds totaled more than US $34,000,000.  (*Id.* ¶ 122.)  Plaintiff Jeimon alleges that all of the investments made into Plaintiff GlidePath were fraudulently induced by Defendant's statements in the aforementioned correspondence.  (*Id.* ¶ 123.)

D.  The Sale of Spherion UK's Software Quality Management Division

On October 16, 2002, Defendant sold Spherion UK's Software Quality Management Division ("SQM") to Systems Testing Associates ("STA") for $100,000.  Plaintiffs allege that

Thompson, who by October 16, 2002 was employed by Glidepath, was the sole director of STA and its owner.  (*Id.* ¶ 68.)  STA then resold the assets for £1,750,000, for an approximately US $2,000,000 profit.  (*Id.* ¶ 71.)  Plaintiffs allege that Thompson's fiduciary duties to Plaintiffs were violated when he usurped this corporate opportunity.  Plaintiffs further allege that, because Defendant was aware of Thompson's position as Glidepath's CEO, and because the transaction was "calculated to assist Thompson in concealing the transaction from plaintiffs," Defendant was aware of Thompson's breach of his fiduciary duties.  (*Id.* ¶¶ 69-70.)

## II.  Discussion

### A.  Standards of Review

#### 1.  Rule 12(b)(6)

The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle- [ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original). In *Bell Atlantic*, *id.* at 1964-69, the Supreme Court also abandoned reliance on the oft-cited line from *Conley v. Gibson* that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," 355 U.S. 41, 45-46 (1957).  As the Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support

16

recovery . . . ." *Bell Atl.*, 127 S. Ct. at 1968.  Instead, the Court emphasized that "[f]actual

allegations must be enough to raise a right to relief above the speculative level . . . [,]" *id.* at

1965, and "once a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint[,]" *id.* at 1969.  Plaintiff must allege

"enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.  If it "ha[s] not

nudged [its] claims across the line from conceivable to plausible, [its] complaint must be

dismissed." *Id.*; *see also Iqbal v. Hasty*, No. 05-5768-cv, — F.3d — , 2007 WL 1717803, at *11

(2d Cir. June 14, 2007) ("After careful consideration of the Court's opinion and the conflicting

signals from it that we have identified, we believe the Court is not requiring a universal standard

of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which

obliges a pleader to amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim plausible.").

     "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to

facts stated on the face of the complaint, in documents appended to the complaint or incorporated

in the complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard*

*F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. West Point-*

*Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)); *see Cortec Indus., Inc. v. Sum Holding, L.P.*,

949 F.2d 42, 47-48 (2d Cir. 1991) (allowing defendant to produce a prospectus with its motion to

dismiss which was integral to the complaint but which plaintiff failed to attach to the complaint);

*see also 2 Broadway LLC v. Credit Suisse First Boston Mortgage Capital LLC*, No. 00 Civ.

5773, 2001 WL 410074, at *5 (S.D.N.Y. Apr. 23, 2001).

2.  Rule 9(b)

Defendant also alleges that Plaintiffs have failed to meet the heightened pleading requirements for fraud outlined in Federal Rule of Civil Procedure 9(b).  In order to give a defendant clear notice of a plaintiff's claims, and to protect a defendant from undue harm to its reputation, allegations of fraud must be plead with specificity.  *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir. 1979).  Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Specifically, the Second Circuit has "read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  "In order to avoid abuse of the less stringent requirement for pleading scienter, however, plaintiffs are required to 'allege facts that give rise to a strong inference of fraudulent intent.'"  *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 663 (2d Cir. 1997) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  A "strong inference" "must be more than merely 'reasonable' or 'permissible'- it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v.*

18

*Makor Issues & Rights, Ltd.*, No. 06-484, 127 S. Ct. 2499, 2502-03 (2007).[5]  "[C]onclusory

allegations that defendant's conduct was fraudulent or deceptive are not enough."  *Alnwick v.*

*European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 639 (E.D.N.Y. 2003) (quoting *Decker v.*

*Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir. 1982) (alteration in original)).  These

requirements ensure that "a complaint alleging fraud" is filed "only after a wrong is reasonably

believed to have occurred," so that the complaint seeks "redress for a wrong, not to find one."

*Segal v. Gordon*, 467 F.2d 602, 607-08 (2d Cir. 1972).

However, Rule 9(b) must still be read in light of the liberal pleading requirement of Rule

8, which only requires a "short and plain statement" of the claim.  *See Ouaknine v. MacFarlane*,

897 F.2d 75, 79 (2d Cir. 1990).  Plaintiffs are not required to plead with detailed evidence.  *See*

*Kravetz v. Brukenfeld*, 591 F. Supp. 1383, 1386 (S.D.N.Y. 1984).  Accordingly, allegations may

be made on information and belief where the fraud is based on matters within the adverse party's

sole knowledge, but still must be accompanied by a statement of the facts upon which the belief

is founded.  *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004).

B.  Fraudulent Intent

Defendant alleges that Plaintiffs' first cause of action should be dismissed because the

---

[5]*Tellabs* concerned a claim arising under the Private Securities Litigation Reform Act of
1995 ("PSLRA"), and therefore its inquiry into and definition of the phrase "strong inference"
concerned the term as used in that statute.  This case does not arise under the PSLRA, and
instead concerns a "strong inference of fraudulent intent" in the context of a common law fraud
claim.  The Second Circuit has not defined what constitutes a "strong inference" in the common
law fraud context with the level of detail that the Supreme Court used in *Tellabs*.  However, the
Supreme Court's guidance in how to interpret inferences extended beyond the specific context of
the PSLRA.  *See* 127 S.Ct. at 2511 ("The strength of an inference cannot be decided in a
vacuum.").  Thus, although the Court recognizes that *Tellabs* does not directly control this case,
it is guided by the Supreme Court's explanation of how competing inferences should be weighed
in determining whether a particular inference should be considered "strong."

facts alleged within the Second Amended Complaint do not raise a sufficiently strong inference of fraudulent intent.  Defendant argues that:  (1) the payment of a success bonus to Thompson does not raise an inference of fraud because it violates no law and Defendant was under no duty to disclose the fee; (2) the Second Amended Complaint fails to plead sufficient facts to establish that there exists any set of facts which would show that Defendant was aware the market for the European CyberCenter Business would collapse at the time any representations to Plaintiffs were made; (3) Thompson's statements cannot be attributed to Defendant, as they were unaware of and not approved by Defendant, and therefore are insufficient to raise an inference of fraud on behalf of Defendant; and (4) Defendant did not make a representation to Plaintiffs regarding Thompson's employment status.  (Def.'s Br. in Supp. of Mot. to Dismiss 2d Am. Compl. Under 9(b) & 12(b)(6) ("Def.'s Br.") 17-22.)

As an initial matter, it is necessary to consider exactly what statements are alleged to be fraudulent in the Second Amended Complaint.  The Second Amended Complaint alleges eight different fraudulent representations made to Plaintiffs or their agents:  (1) the statements regarding the potential market for the European CyberCenter Business made by Thompson at his presentation to prospective buyers in December 2001 (Second Am. Compl. ¶¶ 76-80); (2) Thompson's statements during that presentation regarding the applicability of the European CyberCenter Business Plan (*id.* ¶¶ 52(f)-(g), 52(i)-(j), 78-80, 81(c), 81(e), 85(c), 100(e), 130(c), 136(b)-(d), 145(e), 145(h), 159, 167(b)-(c)); (3) similar statements made by Thompson in a presentation to Plaintiffs' due diligence team in January 2002 (*id.* ¶¶ 83-85); (4) Thompson's representation to Salford during due diligence that Spherion UK was exiting the European CyberCenter Business for reasons unrelated to its prospects for success (*id.* ¶ 97); (5) Browning's

20

letter to Salford, dated April 12, 2002, that stated Defendant was leaving the European

CyberCenter Business due to a change in the economic climate of the United States (*id.* Ex. 17);

(6) Thompson's representation in May 2002 that his employment with Defendant had been

terminated (*id.* ¶ 114); (7) Livonius's May 24, 2002 letter to Solicitor Bloomer that stated

Defendant envisioned a promising market for the European CyberCenter business (*id.* Ex. 20);

and (8) Pnakovich's July 12, 2002 letter to Solicitor Bloomer which stated that Thompson's

employment with Defendant had been terminated (*id.* Ex. 22).

   As more than half of the allegedly fraudulent statements were made by Thompson, it is

prudent first to consider Defendant's contention that it is not responsible for Thompson's

statements.  Defendant argues that:  (1) it did not approve, and was, in fact, unaware of any of the

representations made by Thompson during his presentations to potential investors; and (2)

Plaintiffs' attempts to impute Thompson's statements to Defendant under the doctrine of

*respondeat superior* fail because a duty of inquiry into Thompson's statements arose and

Plaintiffs failed to properly carry out that duty.  (Def.'s Br. 20-21.)  Plaintiffs respond that they

have sufficiently plead both agency liability and *respondeat superior* to survive a motion to

dismiss.  Plaintiffs have the better of the argument.

   An employer does not have to approve, or even be aware of, a representation made by an

employee to be liable for that representation.  It is black-letter agency law in New York that an

employer is liable for the representations of its agents when those representations are made

within the scope of the agent's employment.  *See* 2A N.Y. Jur. 2d Agency & Indep. Contractors

§ 290 (2007); *see also Chubb & Son, Inc. v. Consoli*, 726 N.Y.S.2d 398, 400 (App. Div. 2001);

*Adler v. Helman*, 564 N.Y.S.2d 828, 830 (App. Div. 1991).  "An agent does not cease to act

21

within his or her authority merely because the agent is engaged in a fraud upon a third person."
2A N.Y. Jur. 2d Agency & Indep. Contractors § 290; *see also Parlato v. Equitable Life Assurance Soc'y*, 749 N.Y.S.2d 216, 220-21 (App. Div. 2002).  In addition, the "liability for an agent's fraud or misrepresentation applies even where the principal had no knowledge of the misrepresentation or fraud and intended no fraud."  2A N.Y. Jur. 2d Agency & Indep. Contractors § 291; *see also Marine Midland Bank v. John E. Russo Produce Co.*, 405 N.E.2d 205, 211-12 (N.Y. 1980); *Jarvis v. Manhattan Beach Co.*, 43 N.E. 68, 70 (N.Y. 1896).

Plaintiffs have alleged that Thompson was acting within the scope of his employment when he made the allegedly fraudulent presentations to them, stating in the Second Amended Complaint that Thompson was instructed to find potential buyers from the Spherion liabilities. (Second Am. Compl. ¶¶ 74-75.)  Plaintiffs have also alleged and provided documentation that Thompson's later representations to Plaintiffs were made during the course of his employment. (*Id.* ¶¶ 74-75, 97-100, Exs. 5-17.)  These allegations are sufficient, at the motion to dismiss stage, to attribute Thompson's allegedly fraudulent statements to Defendant.  *See Cosmos Import & Export Ltd. v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, No. 96 Civ. 6224, 1997 WL 328068, at *6 (S.D.N.Y. June 16, 1997) (holding that a complaint that stated a factual basis for attributing an agent's statements to his principal was sufficient to survive the principal's motion to dismiss).[6]

---

[6]As Plaintiffs have adequately pleaded sufficient facts at this stage to attribute Thompson's statements to Defendant, there is no need to consider their other theories of liability, namely *respondeat superior* liability, for Thompson's statements.  It is sufficient that Plaintiff has alleged a plausible set of facts upon which a rational jury could attribute those statements to Defendant.  Defendant argues that Plaintiffs had a duty to inquire into Thompson's authority and that they failed to do so.  Such a dispute is more suitable for summary judgment, not a motion to dismiss.

The Plaintiffs have pleaded sufficient facts regarding seven of the allegedly fraudulent statements to satisfy the requirements of Rule 9(b).  The Second Circuit requires that, to satisfy Rule 9(b), a plaintiff alleging fraud must identify the allegedly fraudulent statements, identify the speaker, state when the statements was made, and explain why the statements are supposedly fraudulent.  *See Rombach*, 355 F.3d at 170.  Plaintiff has done this for seven of the eight allegedly fraudulent statements listed *supra*.  Plaintiff failed to specify, however, when the alleged fraudulent statements that Thompson made to Salford during the course of due diligence were made.  (Second Am. Compl. ¶ 97.)  Thus, the Court will only consider the remaining seven statements that Plaintiffs allege were fraudulent.  *See id.*; *Sun Micro Med. Techs. Corp. v. Passport Health Commc'ns, Inc.*, No. 06 Civ. 2083, 2006 WL 3500702, at *10-11 (S.D.N.Y. Dec. 4, 2006) (dismissing fraud cause of action where plaintiff failed to plead when fraudulent

---

Defendant also argues, in its reply brief, that Thompson's statements cannot be attributed to Defendant because Defendant had to ratify his fraudulent statements to be bound by them. (Def.'s Br. 6 n.8.)  This, again, is an argument for summary judgment.  The doctrine of ratification applies when an agent acts outside the scope of his actual authority, but his or her acts are later ratified by the principal and therefore attributable to it.  2A N.Y. Jur. 2d Agency & Indep. Contractors §§ 169-70 (2007).  Plaintiffs, however, have pleaded that Thompson had actual authority, and they have pleaded sufficient facts to survive a motion to dismiss.  Which theory of New York Agency law is most correct as applied to the facts of this case is a question best answered after the facts are developed in discovery.  Again, it is sufficient at this stage that Plaintiffs have pleaded facts upon which a rational jury could attribute Thompson's statements to Defendant.

Finally, Defendant argues that Plaintiffs had a duty of inquiry into Thompson's authority. Relying on the Second Circuit's decision in *FDIC v. Providence College*, 115 F.3d 136, 141 (2d Cir. 1997), Defendant argues that this duty arises when:  (1) the facts and circumstances are such as to put the third party on inquiry; (2) the transaction is extraordinary; or (3) the novelty of the transaction raises red flags regarding danger or fraud.  Again, as these are all situations regarding the facts surrounding the transaction, and not the allegations in the complaint, this argument is not yet ripe.  However, even assuming it was properly raised at this point, Plaintiffs have alleged that they did inquire into Thompson's status (Second Am. Compl. Ex. 18).  This is sufficient at the motion to dismiss stage.

statements were made or explain why the alleged statements were fraudulent).

In addition to the *Rombach* factors, a plaintiff must also plead sufficient facts to raise a "strong inference" of fraudulent intent.  When considering the inference of scienter raised by a complaint, a reviewing court "must ask:  When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Tellabs*, 127 S. Ct. at 2511.  Although "[g]reat specificity as to scienter is not required," plaintiffs "have the burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter."  *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (internal quotations and citations omitted).   "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (citing *Shields*, 25 F.3d at 1128).  Here, Plaintiffs have met their burden under Rule 9(b).

### 1.  Motive and Opportunity

When pleading scienter based on motive and opportunity, "[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.  Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."  *Shields*, 25 F.3d at 1130.  Here, Defendant does not contest that it had the opportunity to commit the alleged fraud.  All that is at issue is whether Plaintiffs have pleaded sufficient facts to establish that Defendant had a motive to commit fraud. As the Second Circuit has explained, "what is required when endeavoring to plead facts

supporting a strong inference of motive and opportunity is not a bare invocation of magic words such as motive and opportunity but an allegation of facts showing the type of particular circumstances that our case law has recognized will render motive and opportunity probative of a strong inference of scienter."  *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

This is somewhat complicated, however, as courts in the Second Circuit have been much more likely to describe particular circumstances that are *in*sufficient to establish "motive and opportunity," rather than circumstances that are sufficient.  For instance, in *Chill v. General Electric Company*, the Second Circuit held that standard corporate incentives, such as "motive to maintain the appearance of corporate profitability, or the success of an investment" do not entail "concrete benefits" that establish a claim for fraud.  101 F.3d 263, 268 (2d Cir. 1996).  The *Chill* court also held that merely seeking to justify an investment, or to make that investment appear profitable, was insufficient motive to sufficiently plead fraudulent intent in a securities fraud action.  *See id.* at 268.  In addition, a simple economic benefit from an allegedly fraudulent statement may be insufficient, as "we assume that the defendant is acting in his or her informed economic self-interest."  *Shields*, 25 F.3d at 1130.  In short, a motive that is common to every corporation, or to any type of business, normally is not sufficient motive to prove fraudulent intent.  *See In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 230 (S.D.N.Y. 2006).

In some cases, however, a desire to avoid making future payments on an existing liability has been found to be a sufficient motive to survive Rule 9(b).  In *Cohen v. Koenig*, the Second Circuit found that where a complaint contained allegations that one party to a sale had a financial incentive to "paint a far rosier financial picture than actually existed in order to induce" the other party into a sale, such allegations were sufficient to survive Rule 9(b).  25 F.3d 1168, 1174 (2d

Cir. 1994).  Additionally, in *Turkish v. Kasenetz*, the Second Circuit held that a complaint adequately pled motive and opportunity where the alleged motive was financial, specifically "a desire to avoid repaying the loans" and to end prior litigation.  27 F.3d 23, 28 (2d Cir. 1994).

Here, none of Defendant's arguments regarding the inference of fraud, listed *supra*, undermine Plaintiffs' allegations of Defendant's motive to commit fraud.  The Second Amended Complaint alleges ten different financial reasons that motivated Defendant to commit fraud. (Second Am. Compl. ¶ 132.)  These include the desire to avoid nearly € 7,000,000 in existing liabilities.  (*Id.*)  Although many of the other alleged motivations are based on Plaintiffs' allegations that Defendant knew at the time that the European CyberCenter Business had little prospect for success (which Defendant claims is merely pleading fraud by hindsight), both *Cohen* and *Turkish* stand for the proposition that a business seeking to avoid a loss or induce a beneficial sale has sufficient motive to commit fraud to raise the requisite "strong inference" of fraud under Rule 9(b).  In other words, it can be said that the inference of fraud raised by the complaint, considered in light of the existing standards of the Second Circuit, is at least as strong as any opposing inference.  Hence, even if some of Plaintiffs' allegations could be dismissed as fraud by hindsight, there are sufficient allegations in the Complaint to survive Defendant's motion.[7]

---

[7]Defendant also attempts to dispel any inference of fraud from Thompson's statements about market conditions by claiming that they were mere "puffery."  *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996).  However, knowingly false representations about the state of a market, as Plaintiffs allege Defendant made here, are not puffery.  *See Basquiat ex rel. Estate of Basquiat v. Sakura Int'l*, No. 04 Civ. 1369, 2005 WL 1639413, at *5 (S.D.N.Y. July 5, 2005) (finding that statements were not puffery where they included specific detail and were alleged to be knowingly false).

2.  Circumstantial Evidence of Conscious Misbehavior or Recklessness

As Plaintiffs have adequately pleaded motive and opportunity to commit fraud, there is no need for the Court to consider whether they have also sufficiently pleaded conscious misbehavior.  It is noteworthy, however, that even if Defendant's allegations of fraud by hindsight and "puffery" are set aside, Plaintiffs have pleaded with particularity a number of representations which meet the standard for conscious misbehavior.

To meet this standard, a plaintiff must plead specific facts "constituting strong circumstantial evidence of defendants' recklessness, and possibly even conscious misbehavior." *In re Veeco*, 235 F.R.D. at 231.  Here, Plaintiffs have pleaded that at least two of the statements made to them during due diligence were consciously false.  First, in May 2002 Thompson told Plaintiffs that his employment with Defendant had already terminated.  (Second Am. Compl. ¶ 114.)  Second, on July 12, 2002, a representative of Defendant sent a letter to a lawyer for Plaintiffs stating that Thompson's employment had terminated.  (*Id*. Ex. 22.)  According to the allegations in the Second Amended Complaint, Thompsons's employment did not officially end until September 10, 2002.  (*Id*. Ex. 23.)

These statements are specific facts which raise a sufficiently strong inference of fraud to survive Rule 9(b).  "'An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness.'"  *Chill*, 101 F.3d at 269 (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F. Supp. 256, 259 (S.D.N.Y. 1989)).  Viewing the facts in the light most favorable to the Plaintiffs and drawing all reasonable inferences in his favor – as the Court must do at the motion to dismiss stage – it is inconceivable that either Thompson or Defendant would be unaware of Thompson's employment status.

27

A strong inference of fraud is raised by these allegedly conscious misrepresentations regarding the employment status (and the conflicts of interest) of a key player in the transaction. These statements, regardless of the other numerous statements which Plaintiffs allege to be false, also demonstrate that Plaintiffs have raised a sufficiently "strong" inference of fraud pursuant to survive Defendant's motion to dismiss.[8]

C. Fraud and Negligent Misrepresentation

In addition to the Second Amended Complaint's alleged failure to adequately plead fraudulent intent, Defendant also argues that both Plaintiffs' first and second causes of action, the fraud and negligent misrepresentation claims, fail because Plaintiffs have failed to adequately plead loss causation or reasonable reliance. The Court will address each in turn.

1. Loss Causation

Under New York law, common law fraud is "a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, which causes injury." *Solar Travel Corp. v. Nachtomi*, No. 00 Civ. 3564, 2001 WL 641151, at *4 (S.D.N.Y. June 8, 2001). A claim of negligent misrepresentation requires that the plaintiff establish "that the defendant had a duty to use

_____

[8]It is true that these two statements alone may be insufficient to meet the remainder of Plaintiffs' pleading obligations, most notably their obligations to plead transaction causation and loss causation as to the fraudulent statements at issue in the case. However, Plaintiffs need not plead both "motive and opportunity" *and* "conscious misbehavior or recklessness" to prove scienter. One is sufficient. Plaintiffs have pleaded facts sufficient to demonstrate a "strong inference" of fraud as to all of these statements by demonstrating Defendant's motive and opportunity to commit fraud. Thus, although Plaintiffs allegations regarding Defendant's reckless or conscious misstatements might have been, in and of themselves, insufficient to establish their fraud claim, the fact that these statements were recklessly or consciously made bolsters Plaintiffs' argument that they have raised a sufficiently strong inference of fraud to survive Defendant's motion to dismiss.

reasonable care to impart correct information because of some special relationship between the parties, that the information was incorrect or false, and that the plaintiff reasonable relied upon the information provided to his detriment.  *Id.* at *6 (internal quotations and citations omitted).  Loss causation is an essential element of each claim.  *Id.* at *4, 6.  "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  In other words, "[l]oss causation is causation in the traditional 'proximate cause' sense – the allegedly unlawful conduct caused the economic harm."  *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 209 (2d Cir. 2000); *see also Manufacturers Hanover Trust Co. v. Drysdale Secs. Corp.*, 801 F.2d 13, 20 (2d Cir. 1986).   "The purpose of the proximate cause requirement is to fix a legal limit on a person's responsibility, even for wrongful acts."  *First Nationwide Bank*, 27 F.3d at 769.

To adequately plead loss causation, "'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Lentell*, 396 F.3d at 173 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95 (2d Cir. 2001)).  A misstatement or omission of relevant fact is the cause of a loss if "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor."  *Id.*  A plaintiff has adequately pled loss causation with regard to the concealment or misstatement of a material fact if it alleges that its loss was foreseeable to the party alleged to have concealed or misrepresented the material fact and that its loss was caused by the materialization of the concealed (or misrepresented) fact.  *See id.* at 172; *Emergent*

*Capital*, 343 F.3d at 197 ("Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in . . . value [].");  *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) ("To establish loss causation a plaintiff must show, that the economic harm that it suffered *occurred as a result* of the alleged misrepresentations.").

Even where a plaintiff has made such a showing, there are other factors that may limit a plaintiff's claim of loss causation.  "Many considerations enter into the proximate cause inquiry including the 'foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection.'"  *First Nationwide Bank*, 27 F.3d at 769 (quoting *Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir. 1988)); *accord AUSA Life Ins. Co.*, 206 F.3d at 216 ("Foreseeability is tied into loss causation . . . .").  For instance, a plaintiff is unlikely to recover when "the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors . . . ."  *First Nationwide Bank*, 27 F.3d at 772.  Also, a plaintiff must address the possibility that intervening events caused its loss.  *Id.*  A court may also consider other factors typically relevant into proximate cause inquiries.  For example, the Second Circuit has affirmed a district court's dismissal (on a Rule 12(b)(6) motion) of a case where there was a five-year gap between the alleged misrepresentations and the plaintiff's losses.  *See id.* ("When a significant period of a time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim.").  But, where a plaintiff adequately alleges that a defendant's fraud caused plaintiff's loss, the question of whether, in fact, the loss was caused by an intervening event (including a general market loss), the Second Circuit has held, "is a matter of proof at trial and

30

not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital*, 343 F.3d at 197.

Here, Plaintiffs have alleged that Defendant intentionally misrepresented the potential market for the European CyberCenter Business and the suitability of the business plan that it had developed for that market. Other courts in this district have refused to dismiss cases where the plaintiff alleges that a defendant misrepresented the financial health of a company, as well as the profitability of the company's business. *See, e.g., Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 289 (S.D.N.Y. 2004) ("[T]he Banks are alleged to have lied about the financial health and future prospects of RSL – namely, the investment quality of RSL securities. Moreover, RSL ultimately failed because of the very facts that the Banks misrepresented: that RSL was in financial trouble and that the entire 'internet telephony sector' was collapsing."). The Second Circuit came to a similar conclusion in *Suez Equity*. In that case, the defendant was alleged to have misrepresented the inept background of the corporate executive in the subject company. 250 F.3d at 98. The Second Circuit held that this misrepresentation satisfied the plaintiff's obligation to plead loss causation in two ways. First, the misrepresentation directly "caused" a loss because it caused the investors to overestimate the value of their purchase. They assumed they were investing in a business with competent management, which would affect the price. Second, because it was foreseeable that an enterprise run by inexperienced management would fail, the later failure of the business was within the zone of risk created by their misrepresentation. *Id.*

Here, Plaintiffs have alleged that Thompson knew that the market for the European CyberCenter Business was weak or nonexistent and also that he, and thus Defendant, knew that the business plan he pitched to Plaintiffs had little or no prospect for profitability. Plaintiff has

also alleged that these two factors were the reason the business failed.  In the end, like the

plaintiffs in *Fogarazzo* and *Suez Equity*, Plaintiffs have pled that Defendant misrepresented the

"investment quality" of the European CyberCenter Business, and that misrepresentation caused

the business to fail.  Thus, Plaintiffs have met their pleading obligations, and whether or not the

failure of the European CyberCenter Business was in fact caused by Defendant's

misrepresentations, or, as Defendant alleges, by a general market slowdown, is a matter not to be

decided on a motion to dismiss.  *See Emergent Capital*, 343 F.3d at 197.

Defendant contended at oral argument that this scenario does not meet the plausibility

requirements recently announced by the Supreme Court, because Plaintiffs' theory of the case

requires Thompson to have signed on to lead and, more importantly, take a stake in, a business

he knew was doomed to failure.  This is not a frivolous argument; however, Plaintiffs also allege

that Defendant offered to pay Thompson more than a million dollars to ensure this scenario came

about.  That payment is sufficient to make the scheme plausible enough to survive at this stage of

the case.

2.  Reasonable Reliance[9]

---

[9]At the end of the section of their brief arguing a failure to plead loss causation,
Defendant also stated, in one sentence, that Plaintiffs' failure to plead loss causation also
amounts to a failure to plead transaction causation.  (Def.'s Br. 26 ("Plaintiffs, therefore, have
failed to establish either transaction or loss causation . . . .").)  Defendant cited no authority for
this proposition.  In its reply brief, Defendant turned this one phrase into two paragraphs, again
with no authority.  (Def.'s Reply Br. 6-7.)  Defendant's argument regarding transaction causation
is indistinguishable from its argument regarding the reasonableness of Plaintiffs' reliance.  Thus,
although the Court has no obligation to consider an argument for which a party has cited no legal
authority, *see Field Day LLC v. County of Suffolk*, No. 04 Civ. 2202, 2005 WL 2445794, at *18
n.8 (E.D.N.Y. Sept. 30, 2005) ("This is an interesting argument, but because [the defendant] cites
absolutely no authority to support it, the Court will not consider it."), to the extent Defendant's
transaction causation arguments overlap with its reliance arguments, those claims are addressed
here.

_____Reasonable reliance is a necessary element of Plaintiffs' fraud and negligent misrepresentation claims.  *See Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (noting elements of fraud under New York law); *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir. 2000) (noting elements of negligent misrepresentation under New York law).  "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court] considers the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."  *Emergent Capital*, 343 F.3d at 195.  "Although reasonable reliance is a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss, whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss in certain circumstances."  *Allied Irish Banks, P.L.C. v. Bank of America, N.A.*, No. 03 Civ. 3478, 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006) (internal quotations and citations omitted).

Defendant argues that Plaintiffs' reliance was unreasonable as a matter of law because: (1) they were aware of Thompson's potential conflicts of interest at the time they engaged in the transaction; (2) Plaintiffs failed to request any representation regarding Thompson's employment status; and (3) Plaintiffs failed to inquire about any ongoing or future economic arrangement between Thompson and Defendant.  Contrary to Defendant's arguments, Plaintiffs' allegations of reasonable reliance are sufficient to survive at this stage.  Under New York law, a plaintiff bears the burden of protecting itself from fraud made during the course of a business acquisition.  *Id.* However, most cases where courts have granted motions to dismiss because of a failure to adequately plead reasonable reliance have concerned situations where a plaintiff failed to

examine readily available information, relied on oral representations of information when it could easily have asked for additional information, or failed to properly investigate a transaction. *Id.* at *9. The factual situation alleged in the Second Amended Complaint is different, however.

Here, Plaintiffs allege that they did perform due diligence, that they did investigate the representations made to them regarding the European CyberCenter Business, and that they did inquire into Thompson's relationship with Defendant. (Second Am. Compl. ¶¶ 92, 98, 109, 117.) Plaintiffs claim that Defendant thwarted that due diligence by misrepresenting information related to these requests and arranging a payment to Thompson to ensure that the sale went off successfully. This payment allegedly was more than simply a success fee, as it is alleged to include compensation for continuing to work in Defendant's interest after Thompson's employment with Defendant had terminated and during the time he was Glidepath's CEO. (*Id.* Ex. 8.)

Defendant relies primarily on *Emergent Capital*, 343 F.3d at 192, for the proposition that Plaintiffs' failure to request specific representations from Defendant regarding Thompson's employment status demonstrates as a matter of law that their reliance was unreasonable. (Def.'s Br. 27.) However, Plaintiffs allege in the Second Amended Complaint that they did request representation from Defendant regarding Thompson's employment status, and both Thompson and one of Defendant's officers represented to Plaintiffs that he was no longer employed by Defendant at a time when he was still an employee. (Second Am. Compl. ¶ 117, Ex. 22.) In addition, *Emergent Capital* is distinguishable from the present case. In *Emergent Capital*, the plaintiff's claim was based on extra-contractual representations made to it by a close personal friend of a director. The plaintiff had alleged that the close relationship between the two men

made plaintiff's reliance reasonable.  The court rejected that argument.  343 F.3d at 196.  The

court stated, "[g]iven the sophistication of this financial transaction and of the parties, and absent

any allegation of a fiduciary relationship, the personal friendship between [the two directors]

does not make [plaintiff's] reliance on the alleged extra-contractual representations reasonable."

*Id.*  Here, however, Plaintiffs have alleged a fiduciary relationship existed between themselves

and Thompson during a period of the alleged fraudulent scheme.  Although Defendant disputes

that Thompson was a fiduciary of Plaintiffs at the time that many of the allegedly fraudulent

representations were made, the exact nature of Thompson's relationship to Plaintiffs and

Defendant is sufficiently complex that this case is one where the claim of reasonable reliance is

ill-suited for decision on a motion to dismiss.  *See AIG Global Secs. Lending Corp. v. Banc. of

Am. Secs.*, No. 01 Civ. 11448, 2005 WL 2385854, at *9 n.5 (S.D.N.Y. Sept. 26, 2005) ([T]he

issue of whether an investor reasonably relied on a defendant's misrepresentations is a

fact-intensive inquiry that cannot be decided on this motion to dismiss.").

     D.  Aiding and Abetting Breach of Fiduciary Duty

     Defendant also argues that Plaintiffs' third cause of action should be dismissed for failure

to plead knowledge on behalf of Defendant.  The Parties agree that to adequately plead a claim of

aiding and abetting a breach of fiduciary duty under New York law, a plaintiff must allege:  (1)

breach of a fiduciary duty owed to the plaintiff; (2) defendant's knowing participation in the

breach; and (3) damages.  *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996).

Defendant argues that Plaintiffs have failed to plead that Defendant had any knowledge of

Thompson's breach of fiduciary duty.  Plaintiffs allege that Thompson personally received funds

from Defendant to encourage him to cause Glidepath to invest in the European CyberCenter

Business.  If true, such an action would be a breach of his fiduciary duties.  2A N.Y. Jur. 2d

Agency & Indep. Contractors § 215 ("An agent may not have interests in the subject transaction

which are adverse to those of his or her principal."); *see also TPL Assocs. v. Helmsley-Spear,*

*Inc.*, 536 N.Y.S.2d 754, 756 (App. Div. 1989).  Further, Plaintiffs have alleged that Defendant

knew of this transaction, and have attached to the Second Amended Complaint a letter from

Defendant to Thompson stating that, because they could not pay him as an employee once he

became CEO of Glidepath, they would transfer funds to his personal account to ensure that he

take "an active role in [Glidepath's] acquisition of the European CyberCenter Business."

(Second Am. Compl. Ex. 8.)  Thus, Defendant's motion to dismiss Plaintiffs' aiding and abetting

breach of fiduciary duty claims is denied.[10]

        E.  Unjust Enrichment

        Defendant argues that Plaintiffs' claim for unjust enrichment should be dismissed

because, under their interpretation of the facts of the case, "equity and good conscience" do not

require restitution under these circumstances, which is a necessary element of an unjust

enrichment claim.  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).  However, Defendant's

interpretation of the "equity and good conscience" element as applied to these facts is not an

issue for this motion.  The issue before the Court is whether Plaintiffs have pled a set of facts that

states a plausible claim.  All New York law requires at this stage is that a plaintiff plead that the

defendant was enriched, that the enrichment came at the plaintiff's expense, and that the

---

        [10]Defendant also argues that Plaintiffs have failed to adequately plead aiding and abetting
a breach of fiduciary duty as to the SQM transaction.  Plaintiffs did not respond to this argument
in their papers.  However, as the Second Amended Complaint pleads sufficient facts for the cause
of action to survive, Defendant's claim is rejected.

enrichment was unjust. *See id.*; *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 669

(S.D.N.Y. 2000).  That burden is met here. *See Dubai Islamic Bank*, 126 F. Supp. 2d at 669.

(rejecting motion to dismiss where plaintiff had adequately pled basis for unjust enrichment

claim).

### III.  Conclusion

For the reasons stated in this Opinion, Defendant's motion to dismiss the Second

Amended Complaint is DENIED.

SO ORDERED.

Dated:      July 25, 2007
            New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

37